# In the United States Court of Federal Claims

No. 21-1053 C[1]
Filed: July 30, 2021
Re-issued: August 17, 2021[2]

| | |
|---|---|
| BLUE TECH INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| and | ) |
| | ) |
| TELOS CORPORATION, and | ) |
| RED RIVER TECHNOLOGY LLC, | ) |
| | ) |
| *Defendant-Intervenors.* | ) |
| | ) |

*Paul F. Khoury*, Wiley Rein LLP, Washington, D.C., for Plaintiff Blue Tech Inc. *Brian G. Walsh, Cara L. Lasley, Sarah B. Hansen,* and *Adam R. Briscoe,* of counsel.

*Reta E. Bezak*, Trial Attorney, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Patricia M. McCarthy*, Assistant Director, *Catharine Parnell* and *Bret Vallacher*, Trial Attorneys, and *Jaron E. Chriss*, General Services Administration, Office of the General Counsel, of counsel.

---

[1] This bid protest was originally one of four related protests consolidated under the lead case, *Sirius Federal, LLC (f/k/a Force 3, LLC) v. United States*, No. 21-1030C.  Case No. 21-1030C, ECF No. 27.  Following the Court's denial of two of the plaintiffs' preliminary injunction motions, *see Sirius Federal LLC v. United States*, 153 Fed. Cl. 410 (2021), three of the plaintiffs voluntarily dismissed their actions, Case No. 21-1030C, ECF Nos. 79-81.  The Court then deconsolidated the cases.  *Id.* at ECF No. 82.  Only the current bid protest remains.

[2] The Court initially filed this opinion under seal so that the Parties could propose redactions. Redactions are indicated by bracketed ellipses ("[ … ]") below.

*C. Peter Dungan*, Miles & Stockbridge P.C., Washington, D.C., for Defendant-Intervenor Telos Corporation. *Roger V. Abbott* and *Jarrod R. Carman*, of counsel.

*Gregory R. Hallmark*, Holland & Knight LLP, Tysons, VA, for Defendant-Intervenor Red River Technology LLC. *Amy L. Fuentes* and *Kelsey M. Hayes*, of counsel.

## OPINION AND ORDER

**MEYERS, Judge**.

While this post-award bid protest has an administrative record spanning nearly 250,000 pages, its resolution turns on the meaning of just three words: "capable of supporting." In this sprawling procurement, the United States General Services Administration ("GSA" or "the Agency") required offerors to provide quotes for various devices that met certain minimum specifications. For the Advanced Secure Web Gateway Device ("ASWGD") at issue here, the GSA required that any quoted device be "capable of supporting" 6TB of disk storage and 32GB of random-access memory, among other requirements. And the GSA further specified that it sought quotes for the "***DEVICE ONLY***." Following discussions in which the GSA told Plaintiff Blue Tech, Inc. ("Blue Tech") that its quote exceeded minimum requirements for several unspecified devices, Blue Tech proposed a device that was capable of supporting 6TB of disc storage and 32GB of memory but had less of each installed as quoted. The GSA then rejected Blue Tech's proposal solely because it purportedly failed to comply with the minimum requirements for the ASWGD. Blue Tech challenges its exclusion from competition because its quoted device is "capable of supporting" the stated requirements. The Government and Intervenor[3] oppose, arguing that the device *as quoted* must include at least 6TB of disk storage and 32GB of memory. In other words, the opposition to Blue Tech contends that "capable of supporting" means "minimum." Because Blue Tech's quoted device is "capable of supporting" the stated minimum requirements, the GSA's exclusion of Blue Tech's proposal from consideration is arbitrary and capricious.

## I.    Background

### A.    The Solicitation

In March 2019, the United States ("the Government"), acting through the GSA, issued Request for Quotation No. 47QTCA-19-Q-0009 (the "Solicitation" or "RFQ") for the "2nd Generation Information Technology Blanket Purchase Agreement" ("2GIT Procurement"). AR Tab 201a at 110669. The GSA anticipated that the 2GIT Procurement would result in nine Multiple Award Blanket Purchase Agreement ("BPA") awards. *Id.* at 110671. These BPAs serve as "a total solution one-stop-shop in the Information Technology market to meet the needs of the Air Force, Department of Defense (DoD) agencies, and other federal, state, local, regional, and tribal governments." *Id.* at 110676. Each BPA runs for five years and there are no option

---

[3] For purposes of this Opinion, "Intervenor" refers to Defendant-Intervenor Red River Technology LLC ("Red River") and not Defendant-Intervenor Telos Corporation because only Red River submitted briefing regarding judgment on the administrative record and permanent injunctive relief.

periods. *Id.* at 110685. The Government estimated that it would spend $5.5 billion over the life of these contracts. *Id.* at 110687.

According to the Solicitation, offerors could submit quotes in one of three, non-exclusive ways. First, they could submit quotes on their own. *See id., e.g.*, at 110688. Second, they could submit quotes as the lead of a contractor teaming arrangement ("CTA") team with other vendors. *Id.* at 110688-89. Third, they could submit quotes as a member of a CTA team. *Id.* at 110689. There is no limitation to how many CTA teams a vendor could join as a member. *Id.* at 110691.

In November 2019, the Government awarded nine BPAs. AR Tab 302 at 246420. Multiple disappointed Quoters protested the awards before the Government Accountability Office. *Id.* at 246420-21. As a result of these protests, corrective action, and additional protests, the GSA amended the Solicitation with Amendment 0018 in August 2020. *Id.* at 246423. Before Amendment 0018, the Solicitation provided for awards to the highest rated Quoters whose prices were fair and reasonable. *Id.* Amendment 0018 changed the evaluation to a best-value tradeoff between non-price factors and price. AR Tab 201a at 110720. The non-price factors included: (1) Breadth of Original Equipment Manufacturers ("OEM"); (2) Relevant Experience; (3) Socioeconomic Factors; and (4) Supply Chain Risk Management. *Id.* at 110722.

Amendment 0018 also changed the price factor by implementing a "market basket evaluation approach." *Id.* at 110721. The new market basket lists the products that the Government anticipated purchasing most frequently and Quoters had to quote prices for devices meeting each item's minimum characteristics (also specified in the RFQ). *Id.* The purpose of the market basket approach was to "[c]onduct a comparative assessment of market basket pricing received based on the total market basket price" and "[c]onduct a comparative analysis of each item quoted in the market basket." *Id.*

Quoters submitted their market basket quotes in "Attachment E – Market Basket - AMD 18" ("Attachment E"). *Id.* Attachment E is an Excel spreadsheet with various tabs listing all the market basket items in column J and corresponding minimum salient characteristics in column K. *Id.* at 110723; AR Tab 200b.5, "Network (Connect)" tab. To be clear, the RFQ includes types of devices, *e.g.*, a firewall, not a specific brand or model of the devices to be quoted. *See, e.g., id.* at Cell J10. Quoters had to include a quote for a device meeting the RFQ's minimum characteristics for each market basket item. AR Tab 201a at 110723. In addition, Quoters had to submit "spec sheets" documenting that each quoted product met the RFQ's minimum salient characteristics for the item. *Id.* at 110723-24. A spec sheet "summarizes the performance and other characteristics of a product in sufficient detail that allows the evaluation team to understand what the product is and if the item meets or exceeds the . . . minimum salient characteristics of the item requested." *Id.* at 110724-25. According to Amendment 0018, "[f]ailure to quote on each market basket item may result in a Quoter's quote being rejected as being non-responsive to solicitation requirements." *Id.* at 110723. Similarly, "[f]ailure to quote products that either meet or exceed the minimum salient characteristics may result in disqualification for award consideration." *Id.*

Of relevance to this bid protest, one of the market basket items listed in Attachment E was the ASWGD with the following minimum salient characteristics:

***DEVICE ONLY***
Physical: Disk Drives= capable of supporting 6TB SAS; Boot Device= capable of
supporting 16GB SSD (redundant); RAM= capable of supporting 32GB;
Onboard Ports= capable of supporting (2) 10/100/1000Base-T capable w/bypass,
(2) 10/100/1000Base-T (non-bypass); 10/100Base-T, BMC Management Port
Optional NICs= capable of supporting 1GbE Fiber, 10Gb Base-T, or 10Gb Fiber;
Chassis=1 RU
Available slots= 1 Full height; (2) Power supplies= min 350W, redundant, hot
swappable
Integrated Threat Protection

AR Tab 200b.5, "Network (Connect)" tab, at Cell K16 (emphasis in original).

In conducting the best value tradeoff, "[a]ll evaluation factors other than cost or price,
when combined, are significantly more important than cost or price. The Government will not
make an award to a significantly lower rated Quoter with a significantly lower price. The
Government will not make an award to a Quoter with a significantly higher price to achieve
marginally superior rating." AR Tab 201a at 110720.

### B. Blue Tech's Quotes

Blue Tech submitted a quote as a CTA team lead. AR Tab 38 at 2571-72. And Blue
Tech joined three other CTA teams as a member. AR Tab 302 at 246523. In its initial quote,[4]
Blue Tech proposed the [ … ] as its ASWGD. AR Tab 205, Attachment E, "Network (Connect)"
tab, at Cell E16. The [ … ] exceeded the ASWGD's minimum salient characteristics because it
had 8TB of disk drive storage and 32GB of RAM already installed. AR Tab 205 at 119275.

Pursuant to the RFQ, the GSA sent Blue Tech a Confer Session Notice (the "Notice")
informing Blue Tech that its "BPA offered price is too high." AR Tab 245 at 238401. The
Notice further stated that Blue Tech's "quote contains items that exceed the minimum salient
characteristics" and that its quote "would be more competitive if the excesses were removed,
items quoted meet but do not exceed the minimum salient characteristics, [and] the offered prices
are decreased." *Id.* The Government did not inform Blue Tech which items it found exceeded
minimum salient characteristics. *See id.*

In response to the Notice, Blue Tech revised its quote and noted that it made two product
substitutions to lower its total price to a more competitive level. AR Tab 272 at 239135. Blue
Tech substituted the [ … ] as its ASWGD in place of the [ … ]. *Id.* at 239136. The [ … ] costs
$[ … ] per unit, AR Tab 205, Attachment E, "Network (Connect)" tab, at Cell N16, whereas the
[ … ] only cost $[ … ] per unit, AR Tab 272, Attachment E, "Network (Connect)" tab, at Cell
N16. The two [ … ] device numbers refer to the identical device; the only difference is the
amount of hard disk storage and RAM installed in each device. AR Tab 272 at 239148. Instead
of 8TB of disk storage and 32GB of RAM, the [ … ] comes with 3TB of disk storage and 24GB

---

[4] Blue Tech only submitted quotes as the team leader of its proposed CTA team.

of RAM installed.  *Id*.  And the [ … ] could be upgraded with more disk storage and RAM.  *Id*. at 239150-51.

During its evaluation, the GSA reached out to the OEM to ask whether the [ … ] met its minimum requirements, asking:

> Does [ … ] part number [ … ] meet the below salient characteristics?
>
> Physical: Disk Drives= capable of supporting 6TB SAS; Boot Device= capable of supporting 16GB SSD (redundant); RAM= capable of supporting 32GB; Onboard Ports= capable of supporting (2) 10/100/1000Base-T capable w/bypass, (2) 10/100/1000Base-T (non-bypass); 10/100Base-T, BMC Management Port Optional NICs= capable of supporting 1GbE Fiber, 10Gb Base-T, or 10Gb Fiber; Chassis= 1 RU
>
> Available slots= 1 Full height/1 half height; (2) Power supplies= min 350W, redundant, hot swappable
>
> Integrated Threat Protection
>
> More specifically does it have a minimum of 6TB SAS and 32GB RAM?

AR Tab 301 at 246203.  A representative from the OEM responded:

> The [ … ] does not meet the requirements below. However, [ … ] offers the [ … ] and it does meet the requirements.
>
> If there are any other questions[,] please let us know.
>
> Also, would you be able to supply a bit of information related to this request?

*Id*.

As a result, the GSA concluded that "Blue Tech is hereby disqualified from award consideration based upon their failure to quote products that either meet or exceed the minimum salient characteristics for the . . . Advanced Secure Web Gateway Device."  *Id*. at 246204. According to the GSA:

> The quoted part [ … ] does not meet the above stated minimum requirements for "Disk Drives= capable of supporting 6TB SAS". The quoted part only has 3TB of Disk Capacity. Also, the quoted part does not meet the above stated minimum requirements for "RAM= capable of supporting 32GB. The quoted part is only capable of 24GB RAM.

*Id.* at 246202.

Almost all of the Quoters quoted a [ … ] device and [ … ] quoted a [ … ] device.  AR Tab 238 at 237903.  The Government also recognized that:

> [ … ] of the team have quoted for a [ … ] configuration meaning cold stand-by. A cold stand-by means integrated software/firmware with no active license and works with swapping the license with the appliance that this stand-by is replacing.
>
> The specification requirement was for Device only and this part suits that part of the requirement as license was not a part of the requirement.

*Id*.

In the end, the Government awarded nine BPAs to CTA teams, including contracts to three CTA teams on which Blue Tech was a member.  AR Tab 302 at 246523.

## II.    Legal Standard

This Court has jurisdiction over bid protests pursuant to the Tucker Act, which requires the Court to review the Government's action under the standards of the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(1) & (4); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under the APA, the Court determines whether the Government's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Banknote*, 365 F.3d at 1350 (citation omitted).  In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Id.* at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  "When a challenge is brought on the first ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  "Accordingly, the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *id.* (quoting *Latecoere*, 19 F.3d at 1356), "and the 'disappointed bidder bears a heavy burden of showing that the award decision had no rational basis,'" *id.* (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Id.* (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

If an error is found in the procurement, the APA further instructs that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706; *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  The bid protester was prejudiced if "there was a substantial chance it would

have received the contract award but for the" challenged action. *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005)).  To what extent a showing of prejudice is necessary, however, depends on the procurement error.  Specifically, "when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice." *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 50 (2016) (citing generally *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir.2009)); *Banknote*, 365 F.3d at 1351; *see also, e.g., Textron, Inc. v. United States*, 74 Fed. Cl. 277, 329 (2006) ("This prejudice analysis, however, should be reached only when the protestor has shown violation of an applicable procurement regulation.  If the court finds that the Government has acted arbitrarily and capriciously, the analysis stops at that finding."), *appeal dismissed sub nom. Textron, Inc. v. Ocean Tech. Servs., Inc.*, 222 F. App'x 996 (Fed. Cir. 2007), *and dismissed per stipulation*, 223 F. App'x 974 (Fed. Cir. 2007).

Lastly, this bid protest is before the Court pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), which provides for judgment on the administrative record.  *See* RCFC 52.1.  Judgment on the administrative record under RCFC 52.1 "is properly understood as intending to provide for an expedited trial on the record." *Bannum*, 404 F.3d at 1356.  The rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354.

## III.   Judgment on the Administrative Record

The Parties disagree on the proper interpretation of the phrase "capable of supporting" as it pertains to the minimum salient characteristics of the ASWGD.  *See* ECF No. 10-2 at 15-16; ECF No. 11 at 9-10; ECF No. 12 at 6-7.  Specifically, the Parties dispute the meaning of the RFQ's requirements regarding the ASWGD: "Disk Drives= capable of supporting 6TB SAS" and "RAM= capable of supporting 32GB."  AR Tab 200.b5, Attachment E, "Network (Connect)" tab, Cell K16.

### A.   Solicitation Interpretation

The interpretation of a solicitation is a question of law, *Banknote*, 365 F.3d at 1353 (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1999)), and follows the same principles governing the interpretation of a contract, *id.* at n.4 (citing *Grumman Data Sys.*, 88 F.3d at 997-98).  Thus, the Court first looks to the plain language of the solicitation.  *Id.* at 1353 (citing *Coast Fed. Bank, FSB v. United* States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)).  In doing so, the Court also "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  *Id.*  (citing *Coast Fed. Bank*, 323 F.3d at 1038).  "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).  "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning . . . ."  *Banknote*, 365 F.3d at 1353 (citing *Coast Fed. Bank*, 323 F.3d at 1038).

If a solicitation is susceptible to more than one reasonable interpretation, however, it contains an ambiguity. *Id.* (citing *Grumman Data Sys.*, 88 F.3d at 997). "To show an ambiguity[,] it is not enough that the parties differ in their respective interpretations . . . ." *NVT Techs.*, 370 F.3d at 1159 (quoting *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999)). "Rather, both interpretations must fall within a 'zone of reasonableness.'" *Id.* (citing *Metric Constructors, Inc.*, 169 F.3d at 751). If the Court finds the solicitation ambiguous, it next determines whether the ambiguity is patent or latent. *Id.* at 1162. "A patent ambiguity is one that is 'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'" *Id.* (quoting *H & M Moving, Inc. v. United States*, 499 F.2d 660, 671 (1974)) (alteration in original).

For example, "[a] patent ambiguity is present when the contract contains facially inconsistent provisions . . . ." *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018) (quoting *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000)). "This is distinct from a latent ambiguity, which exists when the ambiguity is 'neither glaring nor substantial nor patently obvious.'" *Id.* (quoting *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993)). "If an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail." *NVT Techs.*, 370 F.3d at 1162 (citing *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997)); *see also Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."). Alternatively, if the ambiguity "was not obvious on the face of the solicitation and reliance is shown," the ambiguity will be construed against the Government as the drafter. *NVT Techs.*, 370 F.3d at 1162 (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)).

## B.    Blue Tech's Interpretation of the Solicitation is Reasonable.

According to Blue Tech, "capable of supporting" requires that the proposed device can have 6TB of disk storage and 32GB of RAM (or more) installed in it, not that the quoted device have that much disk storage or RAM installed in it as quoted. ECF No. 10-2 at 15-16. The Government and Intervenor disagree, arguing that the phrase "capable of supporting" means "minimum" and the device must have at least 6TB of disk storage and 32GB of RAM installed as quoted. ECF No. 11 at 9-10; ECF No. 12 at 6-7. As explained below, the Court agrees with Blue Tech's interpretation and concludes that the Government arbitrarily and capriciously excluded Blue Tech from the competition.

### 1.    Blue Tech's interpretation gives meaning to all the Solicitation's related terms.

Blue Tech's interpretation of the Solicitation is reasonable because it gives meaning to all relevant terms of the RFQ. When interpreting a solicitation, like a contract, "[a]n interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *NVT Techs.*, 370 F.3d at 1159 (citation omitted); *see also First Nationwide Bank v. United States*, 431 F.3d 1342, 1347 (Fed. Cir. 2005)

(citation omitted) (same). And the Court presumes that different terms imply different meanings. *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1370-72 (Fed. Cir. 2009).

As Blue Tech argues, ECF No. 10-2 at 16, when the Solicitation called for a minimum amount of something in a device's requirements, the Government used the term "minimum," and when it wanted a specific amount of something, it called for a specific amount (*e.g.*, with the equal sign):

- The Firewall Security Appliance's requirements include "*minimum* storage = 120 GB." AR Tab 200b.5, "Network (Connect)" tab at Cell K10 (emphasis added).

- The Integrated Services Router (Small-Med Branch Network)'s requirements include "*Minimum* Aggregate Throughput= 100Mbps (default) or 300 Mbps (License); . . . *minimum* (3) Onboard WAN/LAN 10/100/1000 ports; *minimum* (2) RJ45 ports; *minimum* (2) SFP ports' *minimum* (2) Network Interface Modules; . . . DDR3 DRAM= *minimum* 4GB; Flash Memory= *minimum* 4GB; . . . Power Supply Options= Internal AC, DC, PoE supported; Form Factor= 1RU." *Id.* at Cell K12 (emphasis added).

- The Aggregation Services Router (Enterprise Network or Internet Edge)'s requirements include "External USB Flash Memory= 1GB." *Id.* at Cell K11.

Yet, for the ASWGD, the RFQ calls for a device that is "capable of supporting" specified amounts of disk storage and RAM. *Id.* at Cell K16. When the RFQ requires a device that is "capable of supporting" something, under *States Roofing* it presumably means something other than "minimum" or equal to. Had the Government wanted the ASWGD to have a minimum amount of disk storage or RAM, it presumably would have stated these requirements as "minimums" or equal to, like it did for many other devices. And at times the RFQ uses the phrase "capable of supporting" and "minimum" or equals when describing various characteristics of the same device. *See* AR Tab 200b.5, "Network (Connect)" tab at Cells K10, K11, K12, & K16. The clear indication is that these terms bear different meanings, and Blue Tech's interpretation of the phrase "capable of supporting" gives distinct meaning to all of them. Therefore, Blue Tech's interpretation is reasonable.

The Government and Intervenor offer several arguments why Blue Tech's interpretation is not reasonable, but each of them fails. *First*, the Government argues that the phrase "capable of supporting" is equivalent to the term "minimum" because the phrase describes what are called *minimum* salient characteristics in the Solicitation. ECF No. 11 at 10 (citing, e.g., AR Tab 200b.5, "Network (Connect)" tab, at Cell K4). But the title "minimum salient characteristics" refers to the market basket items' requisite characteristics, not the characteristics of their subparts. In other words, the specifications in Column K apply to the devices listed in Column J, not characteristics identified in Column K. *See* AR Tab 200b.5, "Network (Connect)" tab. Thus, "Quoters must quote products that meet or exceed the minimum salient characteristics specified for each item listed in the market basket." *See* AR 201a at 110723. And here, the Quoters only provided a quote for the ASWGD, not the hard drives installed in it.

*Second*, the Government argues that Blue Tech's interpretation "produces an absurd result" because "there is no reason it (or other quoters) could not have proposed a device with **no** RAM and **no** harddrive, as long as the device was capable of accepting RAM up to 32 GB and a hard drive up to 6GB." ECF No. 11 at 11 (emphasis in original). According to the Government, "[s]uch a device would not be functional, and as a result, would serve no purpose." *Id.* While the Government may not have intended it, no provision in the Solicitation precludes proposing an ASWGD without RAM or hard drives pre-installed. Indeed, interpreting the Solicitation to allow for such proposals would be reasonable, as the Solicitation clearly states that the minimum salient characteristics for the ASWGD are for the "***DEVICE ONLY***." AR Tab 200b.5, "Network (Connect)" tab, at Cell K16. While the Government insists that the Agency added the "device only" language solely to clarify that licenses were not required, it conceded that the language only infers this understanding, and the Record does not reflect that the Agency ever provided this explanation to the Quoters. Tr. at 32:7-14, 36:17-37:13. And the Record is clear that many Quoters did not get the message, as only [ … ] Quoters quoted cold standby devices without licenses. *See* AR Tab 238 at 237903.

The Court is somewhat surprised to see the Government arguing that the proposed ASWGD must be "functional" as quoted. Tr. at 30:22-31:5 (arguing that the ASWGD without drives couldn't be used "as-is"); s*ee also* ECF No. 11 at 15 (repeating that the device quoted must be functional). In the preliminary injunction stage, the Government argued that the market basket was not intended to provide for working installations. *See* Case No. 21-1030C, ECF No. 53 at 22 (arguing that former plaintiff Countertrade "misunderstands the purpose of the market basket, which was not to offer solutions for specific client needs, but rather to compile a sampling of products in order for GSA to evaluate quoters' prices objectively"). The Court agreed with the Government in ruling against former Plaintiff Countertrade Products, Inc.'s arguments that the cold standby devices that a number of CTA teams quoted failed to meet the Solicitation's criteria because such a device would not function as quoted. *Sirius Federal LLC v. United States*, 153 Fed. Cl. 410, 427 (2021). The Government cannot have it both ways. If the Solicitation truly requires Quoters to quote only functional devices in their proposals, the Government must exclude each of the offerors that proposed the cold standby version of the ASWGD that are not functional as quoted. *See* AR Tab 238 at 237903. But the RFQ's text does not support the Government's argument.

*Third*, the Government argues that Blue Tech's interpretation undermines the Solicitation's market basket approach, which aims to provide a sample of products to objectively compare Quoters' prices. ECF No. 11 at 12 (citing AR Tab 200a at 108736). According to the Government, an accurate comparison of prices requires Quoters to include only "similar" products, which the Government sought through the minimum salient characteristics. *Id.* Thus, the Government argues that Blue Tech's interpretation opens the doors to Quoters proposing "disparate items that result in artificial under- or over-pricing of the market basket." *Id.* at 12-13. But the Government misconstrues the Solicitation, which does not require Quoters to quote ***similar*** products; it requires them to quote ***compliant*** products. If the Government wanted "similar" products, it could have crafted the minimum salient characteristics more narrowly. But the final characteristics for the ASWGD resulted in a wide range of quotes, ranging from $[ … ] to $[ … ]. *See* AR Tab 238 at 237903. One could understandably wonder how this range reflects the quotation of only "similar" products. And Blue Tech's proposed [ … ] price fell at the [ … ] of that range at $[ … ]. *See* AR Tab 272, Attachment E, "Network (Connect)" tab, at

Cell N16.  Therefore, Blue Tech's interpretation hardly undermines the Solicitation's market basket approach.

*Fourth*, the Government argues that Blue Tech's interpretation conflicts with the dictionary definition of the term "capable" as "having attributes . . . required for performance or accomplishment."  ECF No. 11 at 11 (quoting MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/capable (last visited July 21, 2021)).  But it is hard to see how this helps the Government's argument.  As explained above, Blue Tech's quoted device has the attributes necessary (*i.e.,* is capable) to support 6TB of disk storage and 32GB of RAM.  And, as Blue Tech counters, the same dictionary definition of "capable" also includes "having traits conducive to or features permitting something."  *See* ECF No. 13 at 3 (quoting MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/capable (last visited July 21, 2021)).  Given that Blue Tech's quoted device has "features permitting something" (the ability to support 6TB of disk storage and 32GB of RAM), its interpretation is consistent with the dictionary definition as well.

*Fifth*, both the Government and Intervenor argue that Blue Tech's interpretation "effectively reads out" and "renders . . . meaningless" the ASWGD's minimum salient characteristics because Quoters would not be required to quote devices with at least the stated amount of disk storage and RAM.  ECF No. 11 at 11; ECF No. 12 at 7.  Blue Tech's interpretation does no such thing.  There are clearly devices that cannot have 6TB of disk storage and 32GB of RAM installed in them, which Blue Tech's interpretation renders non-compliant.  For example, the [ … ] family of the ASWGD can have a maximum of 1TB of disk storage installed, which is SATA rather than the required SAS,[5] and a maximum of 16GB of RAM.  AR Tab 301 at 246202.  Further, the [ … ] can only be configured with a single boot drive rather than the required two under the RFQ's requirements.  *Id*.  By excluding devices that cannot meet RFQ requirements in any configuration, Blue Tech's interpretation does not render the minimum salient characteristics meaningless.

*Finally*, the Government places great weight on the correspondence between the GSA and the OEM regarding Blue Tech's proposed ASWGD.  ECF No. 11 at 9; ECF No. 15 at 2.  Specifically, the Government notes that the OEM did not consider the proposed device to meet the minimum salient characteristics at issue, *i.e.,* that it was not capable of supporting 6TB SAS and 32GB of RAM.  ECF No. 15 at 2 (citing AR Tab 301 at 246203).  But this evidence is unpersuasive because the Government did not ask the question the Solicitation calls for.  In its email, the Government asked two questions.  AR Tab 301 at 246203.  First, the Government asked: "Does [ … ] meet the below salient characteristics?"  *Id.*  The Government then listed all the minimum salient characteristics for the ASWGD.  *Id.*  Had the Government stopped there, the OEM's answer would be more meaningful.  But it didn't.  Instead, the Government ended its email with: "More specifically does it have a minimum of 6TB SAS and 32GB RAM?"  *Id.*  These are two different questions, reflecting the difference between "minimum" and "capable of supporting" in the minimum salient characteristics, as explained above.  The OEM's response was, "The [ … ] does not meet the requirements below.  However, [ … ] offers the [ … ] and it

---

[5] SATA stands for "Serial Advanced Technology Attachment" and SAS stands for "Serial Attached SCSI."  These are different technologies for transferring data to and from hard drives.

does meet the requirements." *Id.* In other words, the quoted device doesn't have the specified disk storage or RAM installed but can have that much disk storage and RAM installed. Nobody disputes either point. The OEM's view of this provision, seen only in isolation and with the Government asking about minimums installed rather than what can be configured, does not help the Court interpret the RFQ. Particularly when the OEM asked for more context, *see id.*, and apparently never got it.

Contrary to the Government's and Intervenor's arguments, Blue Tech's interpretation gives meaning to all the related terms in the Solicitation and is reasonable.

2.   <u>Blue Tech adhered to its interpretation throughout the 2GIT Procurement.</u>

In a further attempt to cast Blue Tech's interpretation as unreasonable, the Government points to several market basket items with purportedly similar minimum salient characteristics for which Blue Tech proposed items meeting those characteristics as quoted. ECF No. 11 at 11-12. According to the Government, Blue Tech thus knew at the time of its proposal that the Solicitation required the AWSGD to be configured with 6TB of disk storage and 32GB of RAM preinstalled, undermining Blue Tech's "current" interpretation. *Id.*; *see NVT Techs.*, 370 F.3d at 1162 (indicating that protester must have relied on its interpretation of the solicitation when it prepared its proposal). While this could be a reason to discard Blue Tech's interpretation, Blue Tech's proposal does not reflect a different understanding than it asserts here. As Blue Tech points out, the Government only assumes that there are other devices Blue Tech could have quoted that could meet RFQ requirements via upgrade. ECF No. 13 at 6. Based on the Record, none of the Government's examples even hint at a different understanding by Blue Tech in preparing its proposals than the one it advances here. For this reason, the Government's argument fails.

The first market basket item the Government cites is the Multi-User Wireless Access Point Controller. ECF No. 11 at 12 (citing AR Tab 200b.5, "Network (Connect)" tab, at Cell J6). Here, one of the minimum salient characteristics requires the "capacity to support" specified throughput and concurrent users. AR Tab 200b.5, "Network (Connect)" tab, at Cell K6. Blue Tech's proposed device for this item—the [ … ], AR Tab 205 at 118897[6]—meets all these specifications, *see* AR Tab 205 at 118897-900, 1188902-03. There are also [ … ] and [ … ] that do not meet the minimum requirements. *See id.* And [ … ] offers multiple configurations of each. *See id.* at 118899-900. But there is no indication that any of these configurations bring either the [ … ] or [ … ] up to the Solicitation's minimum salient characteristics. In fact, the Record indicates that they cannot. For example, the Solicitation requires that quoted Multi-User Wireless Access Point Controllers have the "capacity to support 20[,]000" concurrent users/devices. AR Tab 200b.5, "Network (Connect)" tab, at Cell J6. According to the device's spec sheet, however, the [ … ] and [ … ] "maximum concurrent users/devices" are 8,192 and 16,384, respectively. *See* AR Tab 205 at 118897. Because the Record indicates that Blue Tech's proposed Multi-User Wireless Access Point Controller is the [ … ] device meeting the RFQ's

---

[6] On Attachment E, Blue Tech quoted a [ … ]. AR Tab 205, "Network (Connect)" tab, at Cell E6). The [ … ] is the [ … ]. AR Tab 205 at 118868. The specifications for the [ … ] series appear at AR Tab 205 at 118895-904.

requirements, Blue Tech's Quote does not undermine its interpretation of the minimum salient characteristics in dispute here.

The Government next cites the Firewall Security Appliance.  ECF No. 11 at 12 (citing AR Tab 200b.5, "Network (Connect)" tab, at Cell J10).  The minimum salient characteristics for the device include "Integrated I/O [Input/Output]" that is "capable of supporting (12) 10M/100M/1Gbase-T Ethernet interface (RJ-45) [and] capable of supporting (4) 10 Gb (SFP+) ethernet interfaces."  AR Tab 200.b.5, "Network (Connect)" tab, at Cell K10.  In addition to the integrated—*i.e.,* built-in—network ports, the characteristics also require the device to be "capable of supporting (8) 10 Gb Ethernet Enh Small Form Factor Pluggable (SFP+) network module."  *Id.*  In layman's terms, the quoted device must be capable of supporting at least 24 network ports of varying types.  Blue Tech quoted the [ … ], AR Tab 205, Attachment E, Network (Connect) tab, at Cell E10, which meets these requirements, *id.* at Cell F10; AR Tab 205 at 118976-77.  The Government argues that Blue Tech could have proposed the [ … ].  ECF No. 11 at 12.  But this argument is puzzling because the [ … ] supports a *maximum* of 16 ports.  AR Tab 205 at 118976-77.  Had Blue Tech quoted the [ … ], as the Government now suggests it could have, it would not have met the minimum salient characteristics for the device, *i.e.,* the ability to support 24 network ports.  That Blue Tech quoted the [ … ], therefore, does not undermine its interpretation of the RFQ that it advances here.

The third market basket item the Government cites is the Aggregation Services Router (Enterprise Network or Enterprise Edge).  ECF No. 11 at 12 (citing AR Tab 200.b.5, "Network (Connect)" tab, at Cell J11).  According to its minimum salient characteristics, the device must include hardware-based encryption that is "capable of supporting 6Gbps throughput," as well as a "minimum (1) Network Interface Module."  AR Tab 200.b.5, "Network (Connect)" tab, at Cell K11.  Of the [ … ] offerings, it appears that only two have a Network Interface Module that can handle 6Gbps throughput of hardware-based encrypted data: the [ … ] and [ … ].  *See* AR Tab 205 at 118944, 118947.  Blue Tech offered the [ … ], AR Tab 205, Attachment E, Network (Connect) tab, at Cell E11, which has the least amount of hardware that is capable of supporting 6Gbps throughput, *see* AR Tab 205 at 118947 (supporting 8Gbps throughput).  Contrary to its assertion, the Government does not identify any device that Blue Tech could have quoted that would only meet its specifications with an upgrade like the ASWGD.  Thus, Blue Tech's proposed [ … ] does not run counter to its interpretation of the minimum salient characteristics at issue.

Lastly, the Government cites the Integrated Services Router (Small-Med Branch Network).  ECF No. 11 at 12 (citing AR Tab 200.b.5, "Network (Connect)" tab, at Cell J12).  The device's minimum salient characteristics require a "Minimum Aggregate Throughput= 100Mbps (default) or 300 Mbps (License)" and "minimum (3) Onboard WAN/LAN 10/100/1000 ports."  AR Tab 200.b.5, "Network (Connect)" tab, at Cell K12.  Blue Tech quoted the [ … ], AR Tab 205, Attachment E, Network (Connect) tab, at Cell E12, and like its proposed Aggregation Services Router, the quoted device was the least equipped version of the Integrated Services Router to satisfy the minimum salient characteristics for throughput and total onboard ports, *see* AR Tab 205 at 119002.  Once again, the Government fails to identify any device like the ASWGD that Blue Tech could have quoted that would have satisfied these requirements with an upgrade.  Nothing about Blue Tech's quoting this item undermines its argument here.

Accordingly, Blue Tech adhered to its interpretation of the ASWGD throughout the 2GIT Procurement, and its interpretation of the RFQ is reasonable.

### C.     The Government and Intervenor's Interpretation is Unreasonable.

As discussed above, the Government and Intervenor disagree with Blue Tech on the meaning of the phrase "capable of supporting" as it pertains to the two minimum salient characteristics at issue for the ASWGD: "Disk Drives= capable of supporting 6TB SAS" and "RAM= capable of supporting 32GB." AR Tab 200.b5, Attachment E, "Network (Connect)" tab, Cell K16. According to the Government and Intervenor, the phrase "capable of supporting" means "minimum" and the device must have at least 6TB of disk storage and 32GB of RAM installed as quoted. ECF No. 11 at 9-10; ECF No. 12 at 6-7. The Court finds this interpretation unreasonable for at least two reasons.

*First*, in contrast to Blue Tech's interpretation, the Government and Intervenor's interpretation does not give meaning to all the terms in the RFQ. *E.g.*, *NVT Techs.*, 370 F.3d at 1159 (citation omitted) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."); *First Nationwide Bank*, 431 F.3d at 1347 (citation omitted) (same). Under their interpretation, "capable of supporting" means the same as "minimum." ECF No. 11 at 9-10; ECF No. 12 at 6-7. As explained above, however, when the RFQ requires that a device be "capable of supporting" something, it presumably means something other than "minimum." *See States Roofing*, 587 F.3d at 1370-72 (finding it reasonable that different terms in a contract imply different meanings). Had the Government wanted the ASWGD to have a minimum amount of disk storage or RAM, it presumably would have stated these requirements as "minimums," like it did for many other devices. *See* AR Tab 200b.5, "Network (Connect)" tab at Cells K10, K11, & K12. And the GSA's use of "capable of supporting" and "minimum" when describing characteristics of the same device further reinforces the conclusions that these terms have different meanings. *See id.* The clear indication is that these terms bear different meanings, but the Government and Intervenor's interpretation would render them equivalent. Therefore, the Government and Intervenor's interpretation does not give meaning to all the terms in the RFQ.

*Second*, the Government and Intervenor's interpretation assumes that the RFQ requires that the proposed ASWGD's disk drives and memory, not the device itself, be capable of supporting 6TB of data and 32GB of data, respectively. ECF No. 11 at 9; ECF No. 12 at 6-7. This is because the Government and Intervenor understand that the market basket items' minimum salient characteristics refer to the hard drives and the memory of the device, and not the device itself. *See* Tr. at 33:1-17; ECF No. 12 at 6; *see also* ECF No. 15 at 1-2; ECF No. 16 at 1-2. But the Government and Intervenor's position is inconsistent with the very structure of Attachment E, as Column K containing minimum salient characteristics clearly amends Column J with the characteristics' corresponding market basket items. *See* AR Tab 200.b.5, "Network (Connect)" tab. In addition, the Government and Intervenor's position does not fit with one of the ASWGD's minimum salient characteristic, "Boot Device= capable of supporting 16GB SSD (redundant)." *Id.* at Cell K16. It is, of course, impossible for a "Boot Device" (singular) to be redundant hard drives. But it is clearly possible, and apparently common, for an ASWGD to support redundant hard drives as its "Boot Device." *See* AR Tab 272 at 239148. Thus, it appears more reasonable that the ASWGD is what must be capable of supporting 6TB of disk

storage and 32GB of RAM, not the physical disk drives or memory, contrary to the Government and Intervenor's contention.

For these reasons, the Court finds the Government and Intervenor's interpretation unreasonable.  And while it is true that nearly all the Quoters proposed devices configured with at least 6TB of disk storage and 32GB of RAM as quoted, AR Tab 205 at 119275, that fact alone does not make the Government and Intervenor's interpretation reasonable.

### D.      At Most, the Government and Intervenor Identify a Latent Ambiguity.

Even if the Government and Intervenor's interpretation that "capable of supporting" means "minimum" (despite the RFQ using the term "minimum" when it requires a minimum) was reasonable, all this interpretation would establish is that the RFQ contains a latent ambiguity.  As discussed at length above, Blue Tech's interpretation is reasonable because it gives meaning and effect to each RFQ requirement.  If the Government and Intervenor's interpretation was also within the "zone of reasonableness," that would mean there is an ambiguity in the RFQ.  *See Banknote*, 365 F.3d at 1353 (citing *Grumman Data Sys.*, 88 F.3d at 997).  The question then would be whether it is a patent or latent ambiguity.  *See NVT Techs.*, 370 F.3d at 1162.  "A patent ambiguity is one that is 'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'"  *Id.* (quoting *H & M Moving*, 499 F.2d at 671) (alteration in original).  For example, "[a] patent ambiguity is present when the contract contains facially inconsistent provisions . . . ."  *K-Con*, 908 F.3d at 722 (quoting *Stratos Mobile Networks USA*, 213 F.3d at 1381).  Conversely, a latent ambiguity is "neither glaring nor substantial nor patently obvious."  *Id.* (quoting *Cmty. Heating & Plumbing*, 987 F.2d at 1579).  "If an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail."  *Id.* (citing *Triax Pac.*, 130 F.3d at 1475); *see also Blue & Gold*, 492 F.3d at 1313 (holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").  Alternatively, if the ambiguity "was not obvious on the face of the solicitation," the ambiguity will be construed against the Government as the drafter.  *NVT Techs.,* 370 F.3d at 1162 (citing *Edward R. Marden*, 803 F.2d at 705).

Here there is nothing that is glaring or obvious about the RFQ's requirements that triggered a duty to inquire.  As explained at length above, the RFQ sought quotes for a "***DEVICE ONLY***."  Thus, when it states that the device's minimum characteristics are that it be "capable of supporting" 6TB of disk storage and 32GB of RAM, there is no indication that the Agency really required a device with specific amounts of disk storage and RAM already installed.  Therefore, if there were an ambiguity, it would be "neither glaring nor substantial nor patently obvious."  *See K-Con*, 908 F.3d at 722 (quoting *Cmty. Heating & Plumbing*, 987 F.2d at 1579).

The Government's and Intervenor's arguments that the ambiguity would be patent are unpersuasive.  The Government argues that the ambiguity would be patent because Blue Tech originally quoted an ASWGD that came pre-installed with more disk storage and RAM than required and proposed other devices that met other similarly phrased minimum salient characteristics.  ECF No. 11 at 13-14.  Thus, the Government argues that "Blue Tech was

confused about what it could propose in order to meet the 'capable of supporting' minimum salient characteristics." *Id.* at 14.  But this argument is unavailing.  As Blue Tech explained, it changed the ASWGD it quoted after the Government's Confer Session Notice stated that it quoted several devices that exceeded minimum requirements and could lower its price by quoting devices meeting only the minimum requirements.  *See* AR Tab 272 at 239135.  The Record reflects that Blue Tech found only two items, including the ASWGD, that could plausibly be viewed as exceeding minimum configurations.  *See* AR Tab 272 at 239135.  As a result, Blue Tech lowered those prices based on the Government's communication, not confusion about what it could offer.  And the Government has not identified what other devices exceeded the RFQ's minimum requirements.  Logic dictates that if Blue Tech's quoted ASWGD did not exceed minimum requirements, there must be at least two other devices that did.  But the Government has pointed to none.  Thus, the Court sees no basis to conclude that Blue Tech was confused in any way regarding what the RFQ required.

As for Intervenor, it argues that the ambiguity is patent because "*every other quoter* whose quotation described the salient characteristics of their Advanced Secure Gateways quoted a device that comes with at least 6 TB disk capacity and 32 GB RAM, without further upgrades." ECF No. 12 at 8 (emphasis in original).  According to Intervenor, "Blue Tech plainly had reason to know that another reasonable interpretation existed . . . and did nothing to inquire about what 'capable of supporting' means prior to submitting its quotation."  *Id.*  As a result, Intervenor concludes that Blue Tech "waived any such patent ambiguity by not protesting it prior to the deadline for quotation submission."  *Id.* at 8-9 (citing, e.g., *Veterans Eval. Servs., Inc. v. United States,* 134 Fed. Cl. 1, 4-5 (2017) (rejecting as waived under *Blue & Gold* a protest ground of "a patent ambiguity that would place a reasonable contractor on notice to inquire about the inconsistency")).  In making this argument, however, Intervenor has not provided the Court with any evidence that Blue Tech knew what others quoted.  Without that evidence, the Court finds that what others quoted has no relevance to what Blue Tech contemplated when preparing its proposal.  Indeed, parties were free to quote devices that exceeded the RFQ's minimum requirements.

Accordingly, even if there was an ambiguity regarding the ASWGD's minimum salient characteristics, it would be latent.  Therefore, Blue Tech has not waived any claim and the RFQ should be construed against the Government as the Solicitation's drafter.  As a result, the Court finds that the Government did not assess Blue Tech's proposal in accordance with the Solicitation.

### E.    Blue Tech was Prejudiced by the Government's Irrational Exclusion of Blue Tech's Proposal.

Because the Government excluded Blue Tech's proposal due to of its quoted ASWGD, the Court proceeds to consider whether Blue Tech was prejudiced as a result.  5 U.S.C. § 706; *see also Data Gen.*, 78 F.3d at 1562 (citations omitted) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  As discussed above, the Court can presume that the Government's action prejudiced Blue Tech given that the Government irrationally failed to follow its own Solicitation.  *See, e.g., Caddell Constr.*, 125 Fed. Cl. at 50 (citations omitted) ("Thus, when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed . . . .").  Indeed,

neither the Government nor Intervenor significantly combats this presumption.  But even if they had, the Court finds that Blue Tech was prejudiced because the Record indicates that the Government would have awarded Blue Tech a BPA based on its proposal had the Government not rejected it because of the conclusion that its quoted ASWGD failed to meet the RFQ's minimum requirements.  *See Glenn Defense Marine*, 720 F.3d at 912 (citations omitted) ("To establish prejudice, [the protestor] must show that there was a substantial chance it would have received the contract award but for the [Government's . . . error].").  The Record clearly establishes this point.  Blue Tech's proposal was ranked [ … ] for price and [ … ] for non-price factors.  *See* AR Tab 302 at 246459.  In conducting its best value tradeoff, the Agency first identified four Quoters that were ranked within the top nine for both price and non-price factors.  *See Sirius Federal*, 153 Fed. Cl. at 423.  Given that Blue Tech's proposal was lower-priced than [ … ] of these four proposals and had a higher non-price score than [ … ] of them, Blue Tech clearly had a substantial chance of an award had the Agency not unreasonably excluded it from the procurement.  And this is just looking at the four proposals the Agency moved ahead with before engaging in any tradeoff.  *See id.* at 423-25.  Had the Agency compared Blue Tech to the remaining contenders, there is a substantial chance that Blue Tech's low price and high non-price scores would have resulted in an award.  There is no argument or reason to believe that any other factor (*e.g.*, the go/no go Supply Chain Management Factor) would eliminate Blue Tech.

Blue Tech was prejudiced by the Government's actions, therefore, and judgment on the administrative record is granted in Blue Tech's favor.

## IV.    Injunctive Relief.

In determining whether to issue a permanent injunction, the Court evaluates four factors.  These are "whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."  *Centech Grp.,* 554 F.3d at 1037 (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).  As explained above, Blue Tech has succeeded on the merits of its claim, as is required, and this factor weighs in favor of granting injunctive relief.  The Court addresses the remaining factors in turn.

### A.    Irreparable Harm

The focus of the irreparable harm inquiry is whether Blue Tech has "an adequate remedy at law absent an injunction."  *Std. Commc'ns, Inc. v. United States*, 101 Fed. Cl. 723, 744 (2011) (citation omitted); *see Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993) (same). Here, Blue Tech argues that it will suffer irreparable harm because it was "improperly deprived" of its CTA team BPA because of the Government's improper evaluation of its proposal and has no other remedy other than an injunction requiring the Government to reevaluate its proposal based on the proper reading of the RFQ.  ECF No. 13 at 8.  The Government counters that Blue Tech faces no harm because it is a member of other CTA teams that allow it to "freely compete for any task orders that it has the capability to fulfill."  ECF No. 11 at 18.

Here, the Record shows that Blue Tech may not bid freely on any task order that it can fulfill.  Rather, as Blue Tech established, it may currently freely bid on only those task orders

that its team leads allow it to.  Blue Tech provides its teaming agreements with two of these teams that make the point clearly.  For example, Blue Tech "may respond, with Team Leader consent, to Ordering Authority to requests for quotes (RFQs) at the task order level when only [Blue Tech's] GSA Schedule is being utilized."  Case No. 21-1030, ECF No. 57-1 at 3.  Similarly, for another of Blue Tech's teams, the "Team Lead shall make all bid/no bid decisions for the Team . . . ."  Case No. 21-1030, ECF No. 57-2 § 1.03.  Blue Tech has no remedy to its inability to bid on RFQs that its team leads do not approve.  Therefore, this factor weighs in favor of an injunction.

## B.    Balance of the Hardships

When considering the balance of the harms, the Court considers whether the harm to the Plaintiff outweighs the harm to the Government and third parties.  *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715-16 (2006); *see also Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009) (same).  In evaluating this factor, the Tucker Act requires the Court to "give due regard to the interests of national defense and national security."  28 U.S.C. § 1491(b)(3).  And "the fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance-of-harms factor on the defendant's side of the scale."  *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 241-42 (1997).

Here, the Court is mindful of the Government's national security concerns.  *See* ECF No. 11 at 19; *Sirius Federal*, 153 Fed. Cl. at 429.  But several aspects of the relief Blue Tech seeks largely minimize this concern.  *First*, as clearly stated in the hearing, Blue Tech is not seeking to enjoin any task orders that the Government has already issued.  Tr. at 66:25-67:10.  As the Court stated in the hearing, it will do nothing to interfere with or interrupt these task orders.

*Second*, Blue Tech is seeking to enjoin additional task order awards pending a re-evaluation of proposals.  *Id.*  But during the hearing Blue Tech stated that if the Government will be re-evaluating proposals promptly, which it appears it will be able to do, it may not be necessary to enjoin further awards so long as the evaluation is completed promptly.  *Id*. at 67:11-16.  Blue Tech expects the necessary re-evaluation can be done quickly because the Record clearly shows Blue Tech would get an award when evaluated, and the Government could then add it as a tenth awardee or replace one of the current awardees.  ECF No. 13 at 8-9.  The Government disagrees, contending that it cannot commit to any timeline until it knows the Court's rationale and can determine what it needs to do to comply with its Order.  ECF No. 15 at 9-10.  But the Government fears that an injunction could upset the 2GIT Procurement for months if it must re-solicit proposals and start the proposal anew.  ECF No. 11 at 18-20.  And Intervenor complains that enjoining all awardees is not necessary because only one of them, presumably the ninth awardee, could be impacted by the re-evaluation.  ECF No. 12 at 11-12.

At this stage, it appears that the harm to the Government and Intervenor can be mitigated, potentially entirely, by limiting the scope of the injunction.  Without any relief, though, Blue Tech will be relegated to being a team member only despite offering one of the highest-rated CTA team lead proposals.  And as the Court explained, there are differences between being a team lead and team member.  This favors a tailored injunction, preferably one that the Parties can agree to based on their review of this Opinion.

### C.      Public Interest

The final factor is the public interest factor, which considers impact of an injunction on the public interest.  And it is well-settled that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."  *Torres Advanced Enter. Sols., LLC v. United States*, 133 Fed. Cl. 496, 534, *redacted opinion issued*, 135 Fed. Cl. 1 (2017) (citation omitted).  That said, "there is a countervailing public interest in minimizing disruption" to the Government. *Akal Sec., Inc.*, 87 Fed. Cl. at 321 (quoting *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 80 (2007)); *see also Aero Corp.*, 38 Fed. Cl. at 242 ("[A] procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion.").  Here, there is clearly an interest in ensuring a fair competition weighing in favor of injunctive relief.  And here too there is an ability to minimize the disruption to the Government through a tailored injunction.  This factor weighs in favor of injunctive relief.

## V.      Conclusion

For the reasons stated herein, the Court holds that Plaintiff Blue Tech has prevailed on the merits and shown that injunctive relief will be appropriate.  Therefore, the Court **GRANTS** Plaintiff Blue Tech's motion for judgment on the administrative record, ECF No. 10, and **DENIES** the Government's and Intervenor's cross motions, ECF Nos. 11, 12.

In light of the Court's findings and conclusions above, the Court orders the Government to propose the terms of a permanent injunction that will adequately address the Court's conclusions on the merits, as enumerated *supra*.  The Government shall file such proposed terms in a status report on or before August 10, 2021 and shall meet-and-confer with Blue Tech and Intervenor (Red River) to determine whether either party will oppose the Government's proposed specific terms of injunctive relief.  Should either party oppose the Government's proposed terms, such party will have one week to file any responsive brief, which shall not exceed five (5) pages. The Government's submission of proposed terms of injunctive relief (pursuant to this Opinion and Order) shall not, of course, constitute any waiver of its appellate rights.

**IT IS SO ORDERED.**

s/ Edward H. Meyers
Edward H. Meyers,
Judge